# CRIMINAL COMPLAINT

**ORIGINAL**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CESAR ARIEL ZAPATA-LANDEROS | Docket No.<br><br>MAGISTRATE'S CASE NO. **SA10-121M** |

Complaint for violation of Title 18, United States Code, Section 373(a).

| NAME OF MAGISTRATE JUDGE<br>ROBERT N. BLOCK | TITLE<br>UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Santa Ana, CA |
|---|---|---|
| DATE OF OFFENSE<br>March 15, 2010 | PLACE OF OFFENSE<br>Orange County | Address of ACCUSED (IF KNOWN)<br>Unknown |

FILED CLERK, U.S. DISTRICT COURT
MAR 16 2010
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:**

On or about March 15 and 16, 2010, in Orange County, within the Central District of California, defendant **CESAR ARIEL ZAPATA-LANDEROS**, with the intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of force against property or against the person of another, namely, the kidnaping, abduction, and holding for ransom any person involving the use of the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission fo the offense, in violation of Title 18, United States Code, Section 1201, and under circumstances strongly corroborative of that intent, solicited, commanded, induced, and otherwise endeavored to persuade such other person to engage in such conduct.

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**

See attached affidavit which is incorporated as part of this Complaint.

**MATERIAL WITNESSES IN RELATION TO THIS CHARGE:** Not Applicable.

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>*/s/ George Boykins*<br>GEORGE BOYKINS<br>SPECIAL AGENT, FEDERAL BUREAU OF INVESTIGATION |
|---|---|

| Sworn to before me and subscribed in my presence,<br>SIGNATURE OF MAGISTRATE JUDGE*<br>ROBERT N. BLOCK | DATE<br>March 16, 2010 |
|---|---|

\* See Rules 3 and 54 of the Federal Rules of Criminal Procedure.

AUSA: __RJK__   BAIL RECOMMENDATION: __DETENTION__

# **A F F I D A V I T**

I, George Boykins, being duly sworn, hereby state as follows:

## I

### **TRAINING AND EXPERIENCE**

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), Los Angeles Field Office, Santa Ana Resident Agency. I have been employed with the FBI as a Special Agent since August 2009. I am currently assigned to the Violent Crimes/Major Offender Squad, which handles investigations of various crimes, including bank robberies, kidnaping, extortion, and criminal street gang activities. I attended law enforcement training academy at the FBI Academy at Quantico, Virginia. Prior to joining the FBI, I was a police officer for approximately seven and a half years for the Orlando Police Department in Orlando, Florida, which work included service on the OPD's SWAT Team and undercover narcotics work.

2. I have participated in the execution of numerous search warrants on residences, hotel rooms, automobiles, and storage facilities in connection with various criminal investigations, including searches for drugs, firearms, ammunition, firearms equipment, cellular telephones, computers, other digital equipment and data storage devices, illegally obtained cash/proceeds, financial records, and other documents.

1

**II**

**PURPOSE OF AFFIDAVIT**

3.   This affidavit is made in support of a criminal complaint against **CESAR ARIEL ZAPATA-LANDEROS** ("ZAPATA"), date of birth November 7, 1986, for violation of Title 18, United States Code, Section 373(a): solicitation of another person with the intent that the person engage in conduct constituting a felony in violation of the laws of the United States that has as an element the use, attempted use, or threatened use of force against the person or property of another, namely, the kidnaping, abduction, and holding for ransom any person involving the use of the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission fo the offense.

4.   The facts set forth in this affidavit are based upon information related to me by other law enforcement personnel, review of recorded conversations, and reports of a confidential informant ("CI"). Where the information is based on my personal knowledge, I endeavor to make that clear in the affidavit. The affidavit is submitted for the limited purpose of establishing that there is probable cause for the criminal complaint against ZAPATA. The investigation is ongoing and developing, and this affidavit does not purport to set forth all of the facts known by me or the other law enforcement officers currently involved in this investigation.

## III

## **PROBABLE CAUSE**

**A.   Commencement Of Investigation**

5.   On or about March 15, 2010, agents with the FBI's Santa Ana Office were advised that a reliable confidential informant ("CI") was contacted by an individual later identified as ZAPATA, who said he was interested in kidnaping, together with the CI, a child of a wealthy family living in the hills in or around Tustin, California.  According to the CI, ZAPATA said he was a former police officer in Tijuana, Mexico, and he had previously done some work providing security for the victim-family.

6.   According to the CI, ZAPATA said that he planned to kidnap a child of the victim-family as his mother drove him to a local school.  ZAPATA's plan was to run the mother's car off the road, disable it, and kidnap one of the two children, who are reportedly in or around the ages of 10 and 12.  ZAPATA said he would demand approximately $300,000 in ransom for the child. ZAPATA further said that, if the ransom were not paid within the allotted time frame, he would cut off two fingers of the child and send it to the victim-family to ensure that they paid the ransom.  ZAPATA said that he's done this type of kidnaping for ransom before, and he said he already conducted some reconnaissance on the victim-family.

3

7.      Agents with FBI's Santa Ana Office immediately commenced an investigation, working together with local law enforcement personnel.

**B.    Meeting Between The CI and ZAPATA At California Lodge Suites**

8.      Agents arranged for the CI to have a meeting with ZAPATA at a motel room where ZAPATA is currently staying, namely, Room #814 at the California Lodge Suites, located at 2909 S. Bristol Street, Santa Ana, California 92706. Agents provided the CI with a recording device to record the conversation.

9.      The CI contacted ZAPATA by telephone to have a consensually-recorded telephone conversation with ZAPATA about what they had discussed earlier. However, ZAPATA said that he'd prefer to speak with the CI in person at ZAPATA's motel.

10.     At approximately 3:24 p.m. on March 15, 2010, the CI met with ZAPATA in ZAPATA's motel room (i.e., Room #814). The CI was able to obtain a recording of the CI's conversation with ZAPATA. Based on information provided to me by other law enforcement personnel familiar with the recording and who are fluent in English and Spanish, I am informed that the recording reveals, in substance and without limitation, the following things:

    a.      The CI and ZAPATA discussed actual execution of the kidnaping. The CI asked ZAPATA if the broad (possibly mother) will resist. ZAPATA said he will hit her. The CI asked about what if the kids started running.

4

      ZAPATA replied that both the CI and ZAPATA would get out of the car fast and at the same time. ZAPATA continued by saying that one of them would stand on one side of the car, and the other on the other side, so the kids would not come running out.

b.   The CI asked whether they would kidnap the woman. ZAPATA replied, "No, what the fuck do we need her for?" The CI said that he thought they wanted to take the woman, too. ZAPATA reaffirmed that they would only take one child.

c.   ZAPATA said that he went to the location (i.e., the home of the victim-family) at 7:00 a.m. and saw a white Mercedes-Benz car. ZAPATA said he only saw one kid. The CI asked if anyone there saw ZAPATA. ZAPATA said that no one saw him.

d.   The CI asked ZAPATA if he had found a place to take him (possibly the child who was to be kidnaped). ZAPATA said, no. ZAPATA noted that he was looking at a storage place. ZAPATA said the place is empty, large, and he already rented it so he and the CI could stay there.

e.   The CI asked how ZAPATA was going to ask for the ransom money, asking specifically if he was going to do it by telephone. ZAPATA confirmed that he would make the request by telephone. The CI asked ZAPATA if he was

      going to ask for $300,000.  ZAPATA said that he would.
      The CI asked if the guy (the child's father) offered
      him less than that.  ZAPATA indicated that would not
      happen.  The Ci noted that people who are millionaires
      usually have a safe at home with lots of money.

f. In discussing the victim-family, including their origins, the CI asked ZAPATA if the place he was talking about is Morocco, in Africa.  ZAPATA said that it was somewhere around there.  He said the guy is blond, but, the (U/I) is dark.  The CI mentioned that they should pick up the guy as well because he also has money.  ZAPATA said, no, and went on to provide some explanation for his view on that.

g. The CI said that ZAPATA should ask for $1,000 stacks of $100 bills.  ZAPATA said that he would not let the guy (possibly child's father) tell him that he does not have any money.

h. ZAPATA said that either he or the CI needs to grab the broad (mother) first.  The CI said that the first thing they need to do is blow the tires and added that there are some knives that are used to blow tires.

i. The CI asked when ZAPATA wanted to do the job.  ZAPATA replied that he wanted to do it by Friday if possible, if not then another day.  The CI said not on Saturday because they might go out.  ZAPATA said that the lady

6

       needs to take the kids to school. ZAPATA said that he followed her to Chapman and she was probably going to take the freeway.

j. The CI asked ZAPATA how long he had been at the motel-suites. ZAPATA said he had been there for a week.

k. The CI asked ZAPATA if he had done this type of work before. ZAPATA talked about how he had kidnaped somebody else before, a male victim. The CI asked if ZAPATA had to use tape. ZAPATA said, yes, on the hands, feet, and mouth. The CI asked what did they say when ZAPATA and company kidnaped the guy. ZAPATA replied, they didn't say anything and got the money right away. The CI mentions that they need tape and some sort of rope to tie up the victim so he won't get away.

l. The CI told ZAPATA that he needed to leave because he needed to run an errand. The CI said he'd call ZAPATA back. The CI said that if they don't do it Friday, they should so it Thursday morning.

C. **ZAPATA Rents Storage Unit With The CS**

11. On March 15, 2010, at approximately 8:10 p.m., the CI met with ZAPATA for the purpose of getting a storage unit to use in holding the kidnaped child. Agents provided the CI with a recording device, but the device malfunctioned and did not record

the conversation. The CI provided the following summary of the meeting:

    a.    ZAPATA and the CI went to Beach Boulevard Storage, located at 14400 Beach Boulevard, Westminster, California 92683. The storage company representative escorted ZAPATA and the CI to Storage Unit #D003. After viewing the storage unit, ZAPATA indicated that he approved of the size and agreed to rent the unit. ZAPATA and the CI walked back to the leasing office with the company representative.'

    b.    While at the leasing office, ZAPATA and the CI completed a "Self Storage Facility Rental Agreement." ZAPATA then provided the company representative a Mexican identification card bearing the number 5945624. ZAPATA then paid for the unit in cash.

    c.    The company representative asked ZAPATA when he was planning to move his belongings into the storage unit. ZAPATA replied, "Maybe tomorrow or Wednesday."

    d.    After parting ways with the company representative, ZAPATA told the CI that he was happy with the size of the storage unit as it was big enough to get his car into the unit. ZAPATA also told the CI that the CI would have to stay inside the storage unit with the kid while ZAPATA made the calls to the victim-family.

8

  e. ZAPATA told the CI that he wanted to go by the victim-family's home to observe the mother drive her children to work. ZAPATA told the CI he wanted the CI to accompany him to the victim-family's home. ZAPATA told the CI that ZAPATA would pick the CI up at a 7-11 Store at 7:00 a.m. on Tuesday, March 16, 2010.

D. **March 16, 2010: ZAPATA Met With CS To Surveil Victim-Family's Neighborhood And Follow Their Car To School**

  12. At approximately 7:09 a.m., March 16, 2010, ZAPATA met with the CS as he previously arranged to do. They met at a 7-11 Store at the corner of Fourth and Grand in Santa Ana, CA. At approximately 7:11 a.m., the CI got into ZAPATA's vehicle, a beige Toyota 4-Runner, bearing California license plate #4AUJ450.

  13. At approximately 7:24 p.m., ZAPATA drove his vehicle, with the CI still in the passenger seat, onto Hideaway Street in the residential neighborhood of Cowan Heights. The victim-family lives on Hideaway street.

  14. ZAPATA's motel room and car have been secured pending issuance of the search warrants requested herein.

E. **ZAPATA's Cellular Telephones**

  15. The CI has advised that ZAPATA has two cellular telephones in his possession. ZAPATA communicates with the CI using the telephone assigned telephone number (714) 468-0756. ZAPATA has communicated with the CI in furtherance of the

kidnaping scheme over at least one of ZAPATA's cellular telephones.

16. Based upon my training, experience, and participation in other investigations, and information learned from other law enforcement agents, I know that persons engaged in violent crimes and other criminal activities often use one or more cellular telephones to communicate with their criminal associates. The use of multiple cellular telephones allows for violent criminals and drug traffickers to compartmentalize their dealings with their criminal associates. This allows leaders of violent criminal activities to control what information is known by each of their criminal associates and minimizes risk that the full extent of their criminal activities will be revealed in the event one of the telephones is compromised.

17. Given ZAPATA's expressed desire to talk with the CI in person at his motel room on March 15, 2010, rather than have a lengthy conversation over the telephone, ZAPATA appears to be cognizant of the risk of wiretaps and other means of interception, and he appears to be experienced in conducting criminal activities in a manner that reduces the risk of police detection.

## IV

### CONCLUSION

18. Based on all of the foregoing facts, and my training and experience, I submit that there is probable cause to believe

that ZAPATA has committed a violation of 18 U.S.C. § 373(a) (solicitation to commit kidnaping for ransom involving use of any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the kidnaping offense).

*George Boykins*
GEORGE BOYKINS
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me this 16th day of March 2010.

ROBERT N. BLOCK
UNITED STATES MAGISTRATE JUDGE